**ON REHEARING**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

DAVID C. HUGHES,
              *Defendant-Appellant.*

THE OFFICE OF THE FEDERAL PUBLIC
DEFENDER,
       *Amicus Supporting Appellant.*

No. 03-4172

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-02-65-PJM)

Argued: October 29, 2004

Decided: March 16, 2005

Before WILKINS, Chief Judge, and TRAXLER and
GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by
published opinion. Chief Judge Wilkins wrote the opinion, in which
Judge Traxler and Judge Gregory joined.

**COUNSEL**

**ARGUED:** William Collins Brennan, Jr., BRENNAN, TRAINOR, BILLMAN & BENNETT, L.L.P., Upper Marlboro, Maryland, for Appellant. Stuart A. Berman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee. James Wyda, Federal Public Defender, Martin G. Bahl, Staff Attorney, for Amicus Supporting Appellant.

---

**OPINION**

WILKINS, Chief Judge:

David C. Hughes appeals his convictions for five counts of bankruptcy fraud and perjury and his subsequent sentence. We affirm Hughes' convictions. However, in light of *United States v. Booker*, 125 S. Ct. 738 (2005),[1] we find plain error in sentencing, exercise our discretion to notice the error, vacate the sentence, and remand to the district court for resentencing consistent with the remedial scheme set forth in Justice Breyer's opinion for the Court in *Booker*. *See Booker*, 125 S. Ct. at 764-65.[2]

I.

In an effort to avoid foreclosure on her Virginia townhouse, Hughes' wife, Norma Gerstenfeld, filed for Chapter 11 bankruptcy protection in October 1997. Because Gerstenfeld suffered from a physical disability, Hughes assisted her in nearly every step of the bankruptcy proceedings. The actions giving rise to Hughes' convictions began when Hughes assisted Gerstenfeld in filing schedules with the bankruptcy court, under penalty of perjury, that understated

---

[1]Consolidated with *United States v. Fanfan*, No. 04-105 (U.S. Jan. 12, 2005).

[2]Subsequent to filing our original opinion in this case, we voted to grant panel rehearing, and we now file this amended opinion.

the value of her personal property by several hundred thousand dollars. Then, without permission from the bankruptcy trustee, Hughes arranged with auction houses in Maryland and New York for the appraisal and sale of some of Gerstenfeld's most valuable assets. On two subsequent occasions while under oath before the bankruptcy court, Hughes testified falsely that he had not authorized the sale of Gerstenfeld's property by the auction houses.

Hughes was charged with three counts of bankruptcy fraud, *see* 18 U.S.C.A. § 152 (West 2000), and two counts of perjury, *see* 18 U.S.C.A. § 1623(a) (West 2000). A jury returned guilty verdicts on all five counts. At sentencing, the district court grouped the five counts together pursuant to *United States Sentencing Guidelines Manual* § 3D1.2(c) (2000) and calculated the sentence as follows:

| | |
|---|---|
| Base offense level for fraud, § 2F1.1(a): | 6 |
| Enhancement for loss greater than $200,000, § 2F1.1(b)(1)(I): | +8 |
| Enhancement for more than minimal planning, § 2F1.1(b)(2)(A): | +2 |
| Enhancement for commission of offense during bankruptcy proceeding, § 2F1.1(b)(4)(B): | +2 |
| Enhancement for abuse of position of trust, § 3B1.3: | +2 |
| Enhancement for obstruction of justice, § 3C1.1: | +2 |
| Final Offense Level: | 22 |

The enhancements to Hughes' sentence were based upon facts found by the district court, not by the jury.[3] Based on an Offense Level of 22 and a Criminal History Category of I, the court sentenced Hughes to 46 months in prison. Hughes now appeals.

---

[3]The only exception to this statement is the enhancement for commission of the offense during a bankruptcy proceeding, *see* § 2F1.1(b)(4)(B). Hughes does not challenge this enhancement on appeal.

## II.

Hughes first argues that the evidence against him was insufficient to support his convictions on the first three counts in the indictment, namely for making false statements in bankruptcy, *see* 18 U.S.C.A. § 152(3); concealing assets, *see id.* § 152(1); and fraudulently transferring assets, *see id.* § 152(7). "In evaluating the sufficiency of the evidence to support a criminal conviction, we must determine—viewing the evidence and all of the inferences reasonably to be drawn from it in the light most favorable to the Government—whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Rahman*, 83 F.3d 89, 93 (4th Cir. 1996).

To be convicted under § 152(1), (3), and (7), a defendant must be proven to have acted "knowingly and fraudulently." 18 U.S.C.A. § 152(1), (3), (7). Hughes contends that the Government failed to prove that he acted fraudulently because it failed to present evidence that he intended to deceive any creditor, trustee, or bankruptcy judge. *See United States v. Sabbeth*, 262 F.3d 207, 217 (2d Cir. 2001) (holding that to sustain convictions under § 152, government must prove defendant acted with "intent to deceive"); *United States v. Gellene*, 182 F.3d 578, 586-87 (7th Cir. 1999) (same). He argues that his disclosure of a trust held for Gerstenfeld's benefit and valued at approximately $5 million removed any motivation he might have had to conceal other personal assets since the disclosure enabled the estate to pay all creditors in full. What Hughes fails to acknowledge is that the Government presented evidence that Gerstenfeld lacked authority to liquidate the trust and instead was at the mercy of the trustee, who had discretion over the trust disbursements. Indeed, it was not clear at the time of the alleged concealment that the reorganization plan would provide for full payment to all creditors. A reasonable jury thus could have concluded that Hughes had ample motive and intent to deceive the creditors and the bankruptcy court. We therefore conclude that the evidence against Hughes was sufficient to support the bankruptcy fraud convictions.

### III.

Next, Hughes argues that the district court violated his Sixth Amendment rights by imposing a sentence exceeding the maximum authorized by the jury findings alone. In light of *Booker*, we conclude that the district court plainly erred in this regard.[4] Accordingly, we vacate the sentence and remand to the district court for resentencing consistent with the remedial scheme set forth in Justice Breyer's opinion for the Court in *Booker*. *See Booker*, 125 S. Ct. at 764-65.

### A.

For almost two decades, sentences for federal offenses have been imposed pursuant to the Federal Sentencing Guidelines, a regime drafted and revised by the United States Sentencing Commission at the direction of Congress. *See generally* Sentencing Reform Act of 1984, *codified as amended at* 18 U.S.C.A. § 3551 *et seq.* (West 2000 & Supp. 2004) *and at* 28 U.S.C.A. §§ 991-998 (West 1993 & Supp. 2004). Designed to facilitate uniformity in sentencing by accounting for the offense of conviction, the "real conduct" underlying the offense, and the individual characteristics of each defendant, the guidelines prescribe ranges of sentences that were generally binding on the district courts. *See* 18 U.S.C.A. § 3553(b)(1). After a defendant was convicted, the guidelines required the district court to make a series of factual findings about the characteristics of the defendant and of the offense, calculating the final sentence using the facts found by the jury and the facts found independently by the court prior to sentencing. Only under very limited circumstances were courts permitted to depart from the ranges prescribed by the guidelines. *See id.* (requiring a district court to sentence within the guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines"); *United States v. Fenner*, 147 F.3d 360, 363 (4th Cir. 1998).

---

[4]We of course offer no criticism of the district judge, who followed the law and procedure in effect at the time of Hughes' sentencing.

In *Booker*, the Supreme Court ruled that the Sixth Amendment is violated when a district court, acting pursuant to the Sentencing Reform Act and the guidelines, imposes a sentence greater than the maximum authorized by the facts found by the jury alone. *See Booker*, 125 S. Ct. at 756. The Court noted that by virtue of § 3553(b)(1), "[t]he Guidelines as written . . . are not advisory; they are mandatory and binding on all judges" and therefore "have the force and effect of laws." *Id.* at 750. In light of the binding nature of the federal regime, the Court found no distinction of constitutional significance between the guidelines and the state sentencing regime it evaluated and found wanting in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). *See id.* at 751. The Court concluded that enhancing sentences based on facts found by the court alone and not by the jury violated the Sixth Amendment imperative that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Having determined that this feature of the federal sentencing regime was unconstitutional, the Court next decided upon an appropriate remedial scheme that would best effectuate Congress' intent in passing the Sentencing Reform Act in light of the Court's constitutional holding. *See id.* Rejecting a solution that would have preserved the mandatory nature of the guidelines while grafting upon them a requirement that all facts providing the basis for enhancements be found by a jury, *see id.* at 757, 759, the Court ruled that Congress would have preferred a solution that rendered the guidelines advisory and restored discretion to courts to impose sentences within the range prescribed by the statutes of conviction, *see id.* at 767-68, as long as those sentences are reasonable, *see id.* at 765-66. The Court therefore severed and excised the provisions of the Sentencing Reform Act that mandated sentencing and appellate review in conformance with the guidelines, *see id.* at 764 (severing and excising 18 U.S.C.A. § 3553(b)(1) and 18 U.S.C.A. § 3742(e)), thereby rendering the guidelines "effectively advisory," *id.* at 757.

In the wake of *Booker*, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines.

Nevertheless, a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing," *id.* at 767. Consistent with the remedial scheme set forth in *Booker*, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence. *See id.* at 764-65. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so.[5] In light of the excision of § 3742(e) by the Supreme Court, we will affirm the sentence imposed as long as it is within the statutorily prescribed range, *see Apprendi*, 530 U.S. at 490, and is reasonable, *see Booker*, 125 S. Ct. at 767.

The *Booker* Court concluded that this remedial scheme should apply not only to those defendants, like Booker, whose sentences had been imposed in violation of the Sixth Amendment, but also to those defendants, like Fanfan, who had been sentenced under the mandatory regime without suffering a constitutional violation. *See id.* at 769 (stating that Fanfan's sentence did not violate the Sixth Amendment but noting that "the Government (and the defendant should he so choose) may seek resentencing under the system set forth in today's opinions"); *id.* ("[W]e must apply today's holdings—both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act—to all cases on direct review.").

## B.

Hughes' sentence exceeded the maximum sentence then authorized by the facts found by the jury alone, in violation of *Booker*. However, Hughes raised this issue for the first time on appeal. Because this issue was not advanced in the district court, we review the district

---

[5]Even the dissent in *Booker*, uncontradicted by the opinion of the Court, acknowledged the "surviving requirement that the court set forth 'the specific reason for the imposition of a sentence different from that described' in the Guidelines." *Booker*, 125 S. Ct. at 790 (Scalia, J., dissenting in part) (quoting 18 U.S.C.A. § 3553(c)(2)). This requirement, from § 3553(c)(2), was not excised by *Booker*, and it continues to govern sentencing courts.

court decision for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). Notwithstanding the heavy burden that a defendant faces when alleging plain error in sentencing, we conclude that the district court plainly erred in imposing a sentence on Hughes that exceeded the maximum allowed based on the facts found by the jury alone.

### 1.

"In reviewing for plain error, our initial inquiry is whether an error occurred." *United States v. Hastings*, 134 F.3d 235, 239 (4th Cir. 1998). In *Booker*, the Court ruled that a sentence exceeding the maximum allowed based only on the facts found by the jury violates the Sixth Amendment. *See Booker*, 125 S. Ct. at 756. Here, under the mandatory guideline regime in existence at the time of sentencing, that maximum would have been calculated according to an Offense Level of 10 (corresponding to a prescribed range of 6 to 12 months' imprisonment), which is the maximum authorized by the facts found by the jury.[6] The imposition of a 46-month sentence, in part based on facts found by the judge, therefore constituted error.

### 2.

"Next, the error must be plain." *Hastings*, 134 F.3d at 239. For purposes of plain-error review, "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Olano*, 507 U.S. at 734. An error is plain "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal." *Johnson v. United States*, 520 U.S. 461, 468 (1997); *accord United States v. David*, 83 F.3d 638, 645 (4th Cir. 1996) (holding that an error is plain when "an objection at trial would have been indefensible because of existing law, but a supervening decision prior to appeal reverses that well-settled law"). When Hughes was sentenced, any claim that imposition of a sentence greater than the maximum authorized under the guidelines by the facts found by the jury alone would violate the Sixth Amendment was foreclosed by circuit precedent. *See United States v. Kinter*, 235 F.3d

---

[6]Hughes conceded that the jury-found facts authorized the enhancement under U.S.S.G. § 2F1.1(b)(4)(B). That provision requires a two-level increase or a minimum Offense Level of 10.

192, 199-202 (2000). *Booker* has now abrogated our previously settled law. The error committed by the district court in sentencing Hughes was therefore plain.

3.

a.

"Third, [Hughes] must establish that the error affected his substantial rights, *i.e.*, that it was prejudicial." *Hastings*, 134 F.3d at 240. To demonstrate that the error was prejudicial, Hughes must show that "the error actually affected the outcome of the proceedings." *Id.*; *accord United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004) (explaining that if an error is not structural, "relief . . . is tied in some way to prejudicial effect, and the standard phrased as 'error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding").

The substantial rights inquiry conducted under Rule 52(b) is the same as that conducted for harmless error under Rule 52(a), with the important difference that the burden rests on the defendant, rather than the government, to prove that the error affected substantial rights. *See Olano*, 507 U.S. at 734-35; *United States v. Williams*, 81 F.3d 1321, 1326 (4th Cir. 1996) (noting that on plain error review, "the question whether a forfeited plain error was actually prejudicial is essentially the same as the question whether nonforfeited error was harmless—the difference being only in the party who has the burden on appeal to show the error's effect"). Our prejudice inquiry, therefore, is governed by the standard set forth by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750 (1946). *See Williams*, 81 F.3d at 1326.

In *Kotteakos*, the Supreme Court admonished that in determining whether an error affected a defendant's substantial rights, the question is *not* whether an error-free proceeding would have produced the same result: "[I]t is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them

sole criteria for reversal or affirmance." *Kotteakos*, 328 U.S. at 763 (citations omitted). Rather, the reviewing court must consider "what effect the error had or reasonably may be taken to have had upon" the outcome of the proceedings. *Id.* at 764. "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Id.* at 765.

The question under the third prong of the plain error analysis is thus whether Hughes has established that the sentence imposed by the district court as a result of the Sixth Amendment violation "was longer than that to which he would otherwise be subject," *United States v. Angle*, 254 F.3d 514, 518 (4th Cir. 2001) (en banc). Hughes has made such a showing. As explained above, the maximum sentence permitted by the jury verdict was 12 months. Unaware of the strictures imposed by the Sixth Amendment, however, the district court imposed a sentence of 46 months. We therefore conclude that the error affected Hughes' substantial rights. *Accord United States v. Promise*, 255 F.3d 150, 160 (4th Cir. 2001) (en banc) (holding that an *Apprendi* error resulting in an increased sentence affected the defendant's substantial rights). The Sixth and Ninth Circuits have reached the same conclusion in assessing Sixth Amendment claims like Hughes'. *See United States v. Ameline*, 2005 WL 350811, at *4-*5 (9th Cir. Feb. 10, 2005) (holding that a Sixth Amendment violation affected the defendant's substantial rights because the sentence imposed by the district court "far exceeded the maximum sentence that the district judge could have imposed under the Guidelines on the basis of facts admitted by Ameline"); *cf. United States v. Oliver*, 397 F.3d 369, 379-80 (6th Cir. 2005) (holding that substantial rights were affected by a Sixth Amendment violation because the defendant "arguably received a sentence that was longer than his sentence would have been absent a Sixth Amendment violation").

b.

Since our initial decision, several circuits have ruled that an assessment of whether the defendant has been prejudiced by a Sixth Amendment error must account for the fact that any resentencing will be conducted pursuant to the remedial scheme announced by *Booker*,

*i.e.*, under an advisory guidelines regime. These courts have held that if the defendant cannot demonstrate that the district court would have imposed a different sentence under an advisory guidelines regime, then the Sixth Amendment error did not affect the defendant's substantial rights. *See United States v. Mares*, 2005 WL 503715, at *9 (5th Cir. Mar. 4, 2005) ("[T]he pertinent question is whether . . . the sentencing judge—sentencing under an advisory scheme rather than a mandatory one—would have reached a significantly different result."); *United States v. Paladino*, 2005 WL 435430, at *10 (7th Cir. Feb. 25, 2005) ("[I]f the judge would have imposed the same sentence even if he had thought the guidelines merely advisory . . . and the sentence would be lawful under the post-*Booker* regime, there is no prejudice to the defendant."); *United States v. Rodriguez*, 398 F.3d 1291, 1301 (11th Cir. 2005) ("[I]n applying the third prong, we ask whether there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case."); *United States v. Crosby*, 397 F.3d 103, 118 (2d Cir. 2005) (holding that a Sixth Amendment error does not prejudice a defendant if the district court determines on remand "that under the post-*Booker/Fanfan* regime the sentence would have been essentially the same as originally imposed").[7] In particular, the Elev-

---

[7]We note that while these courts agree as to the inquiry to be made, they differ as to the manner in which the question is to be answered. The Second and Seventh Circuits have held that prejudice can only be properly assessed by remanding the case to the district court for a determination of whether the same sentence would have been imposed under an advisory regime. *See Paladino*, 2005 WL 435430, at *10 (holding that "what an appellate court should do in *Booker* cases in which it is difficult for us to determine whether the error is prejudicial is, while retaining jurisdiction of the appeal, order a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence"); *Crosby*, 397 F.3d at 117 (holding that "the 'further sentencing proceedings' generally appropriate for pre-*Booker/Fanfan* sentences . . . will be a remand to the district court . . . for the . . . limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence" (quoting 18 U.S.C.A. § 3742(f) (West Supp. 2004))); *cf. United States v. Davis*, 397 F.3d 173, 183 (3d Cir. 2005) (vacating and remanding sentences on the basis that defendants' sentencing challenges under *Booker* present issues that "are best deter-

enth Circuit claims that we failed to recognize that "[t]he prejudice inquiry must focus on what has to be changed to remedy the error." *Rodriguez*, 398 F.3d at 1303. According to the Eleventh Circuit, our refusal to incorporate the remedial scheme into our prejudice analysis

> is wrong because it disconnects the error to be remedied *on remand* from the decision of whether there is to be a remand. The important function of the third prong of the plain error test is to prevent a remand for additional proceedings where the defendant, who failed to make a timely objection, cannot show that there is a reasonable probability that a do-over would more likely than not produce a different result. That is why the yardstick of prejudice is change of outcome—*a different result if the proceeding were done over with the error corrected.*

*Id.* at 1302 (emphasis added) (citation omitted).

This language demonstrates a fundamental misunderstanding of what it means for an error to affect substantial rights. Any inquiry into whether a Sixth Amendment error affected a defendant's substantial rights must take as a given the Sixth Amendment limitation that the district court improperly exceeded. This much is clear from *Kotteakos*, in which the Court noted that the prejudice "inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *Kotteakos*, 328 U.S. at 765.

---

mined by the District Court in the first instance"). Other circuits have rejected this approach on the basis that remanding to the district court to determine prejudice is a misapplication of the plain error rule. *See, e.g.*, *Rodriguez*, 398 F.3d at 1305 ("The determination of plain error is the duty of courts of appeal, not district courts."); *see also Paladino*, 2005 WL 435430, at *13 (Ripple, Circuit Judge, dissenting from the denial of rehearing en banc) ("The panel never tells us what it plans to do with cases in which retirement, disability or death has made impossible consultation with the district judge who imposed the unconstitutional sentence."). An examination of the approach taken by the Second and Seventh Circuits is beyond the scope of this appeal.

The manner in which the *Kotteakos* prejudice inquiry is to be performed in cases of *Apprendi* error on plain error review is illustrated in our en banc decisions in *Promise* and *Angle*. In *Promise*, we found that the defendant's substantial rights were affected by the imposition, based on judge-found facts, of a sentence ten years longer than the maximum penalty authorized by the jury verdict. *See Promise*, 255 F.3d at 160. In *Angle*, decided the same day as *Promise*, we concluded that a similar *Apprendi* error—imposition of a sentence of 292 months' imprisonment on one of the counts of conviction, for which the maximum penalty authorized by the jury verdict was 240 months' imprisonment—did not affect the defendant's substantial rights. *See Angle*, 254 F.3d at 516, 518-19. We reached this conclusion because, had the district court been aware at sentencing of the relevant Sixth Amendment limitation, the guidelines "would have obligated [the court] to achieve the guideline sentence of 292 months imprisonment by imposing a term of imprisonment of 240 months or less on each count of conviction and ordering those terms to be served consecutively to achieve the total punishment mandated by the guidelines." *Id.* at 518 (citing U.S.S.G. § 5G1.2(d)).

In sum, *Promise* and *Angle* indicate that the prejudice inquiry in the case of a Sixth Amendment violation under *Apprendi* and its progeny —including *Booker*—is whether the district court could have imposed the sentence it did without exceeding the relevant Sixth Amendment limitation. If the answer to this inquiry is "yes," as was the case in *Angle*, then the defendant has failed to demonstrate an effect on substantial rights; if the answer is "no," as in *Promise*, the defendant has made the required showing.[8]

This analysis demonstrates why incorporation of the remedial regime into the prejudice analysis is contrary to *Kotteakos* and our established circuit precedent. Considering the *Booker* remedy in determining whether a defendant has established an effect on substantial rights from a pre-*Booker* Sixth Amendment violation would essentially require us to disregard the Sixth Amendment error altogether. It is one thing to conclude, as we did in *Angle*, that there is

---

[8]This case does not present, and we do not address, the question of whether a defendant suffers prejudice because a sentencing court fails to treat the guidelines as advisory in determining the sentence.

no prejudice because the Sixth Amendment limitation did not require the district court to impose a lower sentence; it is quite another to say that there is no prejudice because the Sixth Amendment limitation simply will not apply on remand.

A hypothetical may help to illustrate the flaw in the rule we reject. Suppose a district court admits evidence of a certain type during trial, and the defendant is convicted. While the defendant's appeal is pending, the Supreme Court holds that the admission of this type of evidence is impermissible. On plain error review, we surely would not say that the defendant has failed to demonstrate prejudice because he would likely be convicted on a retrial without the evidence being admitted. Rather, any conclusion that the defendant had failed to demonstrate prejudice would have to rest on the conclusion that the verdict of guilty actually returned was valid despite—*i.e.*, notwithstanding—the wrongful admission of evidence. *Accord Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("The inquiry . . . is not whether, in a [proceeding] that occurred without the error," the same result would have been reached, "but whether the [outcome of] *this* [proceeding] was surely unattributable to the error."). In short, the proper focus is on what actually happened as a result of the error, not what might happen in a subsequent proceeding on remand.

Our conclusion that Hughes' Sixth Amendment claim must be analyzed without reference to the remedial scheme is supported by *Booker* itself. Had the Court considered the remedial scheme when it analyzed Booker's Sixth Amendment claim, it would have been faced with the novel question, in deciding whether Booker's substantial rights were affected, of whether the district court would have imposed the same sentence under an advisory regime.[9] This was a question not addressed by the Seventh Circuit, which vacated and remanded Booker's sentence on the strength of its determination that the sentence imposed on Booker exceeded the maximum penalty authorized by the jury verdict. *See United States v. Booker*, 375 F.3d 508, 509,

---

[9]It appears that Booker preserved his constitutional claim in the district court, for neither the Seventh Circuit nor the Supreme Court applied plain error review when considering Booker's appeal. Regardless, except for who bears the burden, the prejudice inquiry is the same, as we have already noted.

514 (7th Cir. 2004). Nevertheless, the Supreme Court affirmed the judgment of the Seventh Circuit in its entirety. *See Booker*, 125 S. Ct. at 769. That the Supreme Court did not even mention, much less discuss, such a twist to its previously settled pattern of assessing Sixth Amendment errors under *Apprendi* indicates that no such alteration of the prejudice analysis was contemplated by the Court.[10] *See United States v. Milan*, 398 F.3d 445, 454 (6th Cir. 2005) (holding that remand of Booker's claim for resentencing "amounts—at the very least—to a holding that sentencing Booker in a manner that violated the Sixth Amendment affected his substantial rights" and stating that "[i]t is hard to see how the Eleventh Circuit's decision in *Rodriguez* is consistent with this result").

For these reasons, we decline to consider the *Booker* remedial scheme when assessing whether Hughes has demonstrated that he was prejudiced by the plain violation of his Sixth Amendment rights under *Apprendi*.

c.

Before turning to the fourth prong of the plain error analysis, we pause to address two other matters.

---

[10]We also question whether it is appropriate to consider the remedial scheme only with respect to the third prong of the plain error analysis. If one is to conclude that the remedial scheme is to be considered when analyzing a pre-*Booker* Sixth Amendment error, it seems more logical to say that *Booker* obviated the Sixth Amendment error. *Cf. United States v. Antonakopoulos*, 399 F.3d 68, 75-76 (1st Cir. 2005) (holding that a "*Booker* error" inheres in treating the guidelines as mandatory and indicating that a Sixth Amendment claim under *Apprendi* or *Blakely* is sufficient to preserve a claim of *Booker* error). It is apparent, however, that this is not the analysis the *Booker* Court applied. *Compare Booker*, 125 S. Ct. at 769 (holding, with respect to Booker, that the district court "imposed a sentence higher than the maximum authorized solely by the jury's verdict"), *with id.* (holding that Fanfan's sentence did not violate the Sixth Amendment because it was "lower than the sentence authorized by the Guidelines as written"). Indeed, it would be truly unusual to conclude that a defendant's Sixth Amendment challenge to his guidelines sentence is defeated by the very decision that establishes the validity of that challenge.

i.

The Eleventh Circuit maintains in *Rodriguez* that when a defendant, like Hughes, alleges that his Sixth Amendment rights have been violated by the use of extra-verdict enhancements under a mandatory guidelines regime, the appellate court should redefine the error as a failure to treat the guidelines as advisory. *See Rodriguez*, 398 F.3d at 1303 ("The defendant does not get to define the constitutional error."). This opinion maintains that redefinition is required because that is what the Supreme Court did in its ruling in *Booker*: "The Supreme Court defined the constitutional error in *Booker*, and there the Court said that there would not have been any constitutional error if the guidelines had been used in an advisory instead of mandatory fashion." *Id.* The *Rodriguez* panel fails to appreciate that after *Booker*, there are two potential errors in a sentence imposed pursuant to the pre-*Booker* mandatory guidelines regime: a Sixth Amendment error, which Hughes raised, and an error in failing to treat the guidelines as advisory, which Hughes did not raise.

The *Booker* Court recognized that the Sentencing Reform Act and the guidelines, if applied as written, would in some cases result in violation of defendants' Sixth Amendment rights through the mandatory use of extra-verdict enhancements. The Court remedied this Sixth Amendment problem by making the Guidelines "effectively advisory" in *all* cases, so that a jury verdict of guilt would authorize a sentence up to the maximum set by the statute of conviction. *Booker*, 125 S. Ct. at 757. The Court noted that under established law, its remedy would apply to all cases pending on direct appeal at the time of its decision. *See id.* at 769 (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)).

The creation of the *Booker* remedial scheme thus gave rise to a separate class of error, namely, the error of treating the guidelines as mandatory at sentencing. Such an error is distinct from the Sixth Amendment claim that gave rise to the decision in *Booker*, and it is non-constitutional in nature. *See id.* at 769 (holding that Fanfan's sentence did not violate the Sixth Amendment but noting that either party "may seek resentencing under the system set forth in today's opin-

ions"). This error may be asserted even by defendants whose sentences do not violate the Sixth Amendment.[11]

The former mandatory nature of the guidelines was, of course, an essential factual predicate to the finding of a Sixth Amendment violation by the *Booker* Court. It was the mandatory nature of the guidelines that rendered them statute-like and thus subjected guidelines sentences like Hughes' to the rule of *Apprendi*. *See id.* at 750. And, it was the guidelines in their mandatory form that supplied the maximum sentence authorized by the jury verdict. *See Blakely*, 124 S. Ct. at 2537 (stating that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*"). Nevertheless, the constitutional error the Court identified in *Booker* was the same error identified in *Apprendi* and *Blakely*: the use of judge-found facts to impose a sentence in excess of the maximum authorized by the jury verdict alone. *See Booker*, 125 S. Ct. at 756.

Stated differently, the act of mistakenly treating the guidelines as mandatory is not part of the Sixth Amendment error before us, despite the fact that the former mandatory nature of the guidelines set the stage for the constitutional violation in *Booker*. That the erroneous

---

[11]The flaw in the analysis of the Eleventh Circuit is encapsulated in this sentence:

> The constitutional error is the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge; the error is the mandatory nature of the guidelines once the guidelines range has been determined.

*Rodriguez*, 398 F.3d at 1301. The first clause is entirely correct. The second clause, however, is wrong because a mandatory guidelines regime poses a constitutional problem only insofar as the guideline range involves extra-verdict enhancements. Just as the use of extra-verdict enhancements does not violate the Constitution in an advisory sentencing system, *see Booker*, 125 S. Ct. at 750, 764, so too the mandatory nature of the system does not violate the Constitution when the guideline range does not include any extra-verdict enhancements, *see id.* at 769 (holding that Fanfan's sentence, imposed under the mandatory guidelines regime without the use of extra-verdict enhancements, did not violate the Sixth Amendment).

treatment of the guidelines as mandatory is not part of the constitutional error can be seen most clearly in a post-*Booker* context. Suppose a district court, post-*Booker*, erroneously treats the guidelines as mandatory when imposing a sentence that rests in part on extra-verdict enhancements. Such a sentence would certainly be erroneous, but there would be no Sixth Amendment error because, regardless of what the district court thought, the guidelines post-*Booker* are in fact advisory and the sentence imposed did not exceed the maximum authorized by the jury verdict (which is, of course, the maximum set forth in the statute of conviction).

In light of the flaw in the reasoning of *Rodriguez*, we decline to alter our previous conclusion that Hughes has demonstrated that his substantial rights were affected by the Sixth Amendment error committed by the district court under the pre-*Booker* guidelines regime.

ii.

The Supreme Court recently discussed the nature of the third-prong inquiry in *Dominguez Benitez*, 124 S. Ct. at 2338-40. Some of the language in *Rodriguez* could be taken to mean that the Eleventh Circuit believes that *Dominguez Benitez* heightened the standard for demonstrating an effect on substantial rights on plain error review above the traditional standard set forth in *Kotteakos*. *See Rodriguez*, 398 F.3d at 1302 (citing *Dominguez Benitez* for the proposition that a demonstration of an effect on substantial rights requires proof that "a do-over would more likely than not produce a different result"). To the extent the *Rodriguez* panel adopted this reading of *Dominguez Benitez*, we think it is incorrect.

The defendant, Carlos Dominguez Benitez (Dominguez), pleaded guilty to a drug trafficking offense. *See Dominguez Benitez*, 124 S. Ct. at 2336-37. During the plea colloquy, the district court failed to inform Dominguez, as required by Rule 11 of the Federal Rules of Criminal Procedure, that he could not withdraw his guilty plea if the court did not accept the Government's sentencing recommendation. *See id.* at 2337. After the district court imposed a sentence longer than that recommended by the Government, Dominguez appealed. *See id.* at 2337-38. The Ninth Circuit reversed on plain error review, concluding in part that Dominguez's substantial rights were affected

because "the court's error was not minor or technical and . . . [Dominguez] did not understand the rights at issue when he entered his guilty plea." *United States v. Dominguez Benitez*, 310 F.3d 1221, 1225 (9th Cir. 2002).

The Supreme Court granted certiorari to consider a question not addressed in *United States v. Vonn*, 535 U.S. 55, 63 (2002), in which the Court had held that the plain error standard of Rule 52(b) applied to forfeited Rule 11 challenges: Whether demonstration of an effect on substantial rights requires a defendant to establish that he would not have pleaded guilty in the absence of the error. *See Dominguez Benitez*, 124 S. Ct. at 2338. The Court answered this question in the affirmative. *See id.* at 2339-40. Relying on *Kotteakos*, the Court observed that "the standard phrased as 'error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding" or a "'substantial and injurious effect or influence in determining the . . . verdict.'" *Id.* at 2339 (alteration in original) (quoting *Kotteakos*, 328 U.S. at 776). The Court also noted that "[i]n cases where the burden of demonstrating prejudice (or materiality) is on the defendant . . . we have invoked a standard with similarities to the *Kotteakos* formulation in requiring the showing of 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" *Id.* (second brackets in original) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)(opinion of Blackmun, J.)).[12]

Having articulated these general standards, the Court turned to the question of how these rules ought to apply in the Rule 11 context. The Court stated that the "burden should not be too easy," for at least two reasons. *Id.* at 2340. The first of these was "the policies that underpin Rule 52(b) generally, [which] encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." *Id.* Second, and specific to Rule 11 proceedings, was "the particular importance of the finality of guilty pleas, which usually rest, after all, on a defendant's profession of guilt in open

---

[12]In *Bagley*, the Court adopted the prejudice standard of *Strickland v. Washington*, 466 U.S. 668, 694 (1984), which concerned ineffective assistance of counsel, for cases involving the failure to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

court, and are indispensable in the operation of the modern criminal justice system." *Id.* In light of these policies, and in view of the fact that the error alleged was not a due process violation, the Court concluded that a defendant challenging a Rule 11 colloquy on plain error review "must show a reasonable probability that, but for the error, he would not have entered the plea." *Id.*

It is thus clear that *Dominguez Benitez* did nothing to change established principles of plain error review. Although the Court did look to the underlying purpose of Rule 52(b) in articulating the standard, it appeared to be primarily concerned with the particular nature of a Rule 11 violation and the need to preserve the finality of guilty pleas. Indeed, the Court noted that a standard very similar to the one it had adopted had been employed by some courts on *harmless error* review of Rule 11 violations, *see id.* at 2339 n.8, further indicating that the nature of the violation, not the forfeiture of the error, controlled the decision of what showing defendants in Dominguez's situation would be required to make. The Court certainly gave no indication either that it was altering the established rule of *Kotteakos* or that it was abandoning its previous holding that determining, on plain error review, whether substantial rights are affected "normally requires the same kind of inquiry" as that made on harmless error review, *Olano*, 507 U.S. at 735. We therefore reject any suggestion that *Dominguez Benitez* requires us to depart from our established rule that, in considering on plain error review whether a defendant has demonstrated an effect on substantial rights, we simply "apply the obverse of the harmless error test as expressed in *Kotteakos*," under which the pertinent question is whether the erroneous action "substantially swayed" the decision maker. *Williams*, 81 F.3d at 1326 (internal quotation marks omitted).

4.

Finally, it remains within our discretion to determine whether the district court error warrants reversal. "Our discretion is appropriately exercised only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hastings*, 134 F.3d at 244 (alteration & internal quotation marks omitted). We conclude that exercise of our discretion is

warranted here. As a result of a plain and prejudicial Sixth Amendment error, Hughes was sentenced to a term of imprisonment nearly four times as long as the maximum sentence authorized by the jury verdict. There can be no doubt that failure to notice such an error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Ford*, 88 F.3d 1350, 1356 (4th Cir. 1996) (noticing a plain, prejudicial sentencing error that would have caused the defendant to "serve a term of imprisonment three years longer than required by the sentencing guidelines"); *see also Oliver*, 397 F.3d at 380 (noticing a plain, prejudicial error under *Booker*).

The record does not provide any indication of what sentence the district court would have imposed had it exercised its discretion under § 3553(a), treating the guidelines as merely advisory.[13] *Cf. United States v. Hammoud*, 381 F.3d 316, 354 (4th Cir. 2004) (en banc) (recommending "that district courts within the Fourth Circuit announce, at the time of imposing a guidelines sentence, a sentence pursuant to 18 U.S.C.A. § 3553(a), treating the guidelines as advisory only"), *cert. granted, judgment vacated*, 125 S. Ct. 1051 (2005). Thus, although it is certainly possible that Hughes will receive the same sentence on remand, there is nothing in the record to compel such a conclusion. This possibility is not enough to dissuade us from noticing the error.[14]

---

[13]We are not called upon today to decide whether we would notice the error had the district court indicated that it would have imposed the same sentence in the exercise of its discretion.

[14]It is not enough for us to say that the sentence imposed by the district court is reasonable irrespective of the error. The determination of reasonableness depends not only on an evaluation of the actual sentence imposed but also the method employed in determining it. Moreover, declining to notice the error on the basis that the sentence actually imposed is reasonable would be tantamount to performing the sentencing function ourselves. This is so because the district court was never called upon to impose a sentence under an advisory guidelines regime. That the particular sentence imposed here might be reasonable is not to say that the district court, now vested with broader sentencing discretion, could not have imposed a different sentence that might also have been reasonable. We simply do not know how the district court would have sentenced Hughes had it been operating under the remedial scheme announced in *Booker*.

## IV.

As noted in Part III.A., the first step for sentencing courts is to determine the range prescribed by the guidelines after making such findings of fact as are necessary. Here, the district court has already determined that the guideline range for Hughes' convictions is 41 to 51 months (based on an Offense Level of 22 and a Criminal History Category of I). Hughes challenges this calculation on a number of grounds. Because the district court must consider the correct guideline range before imposing a sentence on remand, the same calculation issues already raised by Hughes are likely to arise again. We therefore take this opportunity to address them.[15]

## A.

Hughes first argues that the district court erred by applying an eight-level increase to his offense level to account for an intended loss of $343,696. *See* U.S.S.G. § 2F1.1(b)(1)(I) (calling for an eight-level enhancement for losses between $200,000 and $350,000). Hughes argues that this enhancement was improper because there was no actual loss to the creditors. He correctly notes that under the reorganization plan, all of the creditors were to be paid in full. He also asserts that his intention in transferring Gerstenfeld's personal property to the auction houses—without permission of the bankruptcy trustee—"was to sell it to raise money to *pay the creditors sooner—not to harm them*." Br. of Appellant at 26.

We review de novo the district court interpretation of what constitutes "loss" under § 2F1.1 of the guidelines. *See United States v. Miller*, 316 F.3d 495, 498 (4th Cir. 2003). Once the correct interpretation is established, we accept the district court calculation of loss absent clear error. *See id.* at 503.

"Loss under § 2F1.1(b)(1) is the actual, probable, or *intended loss* to the victims." *United States v. Parsons*, 109 F.3d 1002, 1004 (4th

---

[15]While we address Hughes' challenges here, we do not hold that in every case involving a *Booker* issue, this court must first address alleged calculation errors before vacating and remanding for resentencing in light of *Booker*.

Cir. 1997) (emphasis added) (internal quotation marks & alteration omitted). The intended loss "will be used if it is greater than the actual loss," U.S.S.G. § 2F1.1, comment. (n.8), "even if this exceeds the amount of loss actually possible, or likely to occur, as a result of the defendant's conduct," *Miller*, 316 F.3d at 502. Thus, in determining the amount of loss in a bankruptcy fraud case, courts may look to "the amount of loss [the defendant] intended to cause by concealing assets," rather than "the amount of loss creditors actually suffered." *United States v. Walker*, 29 F.3d 908, 913 n.4 (4th Cir. 1994).

The district court observed that at the time of the concealment it was far from clear that there would be sufficient assets to pay the creditors in full. This, to the district court, implied that Hughes "wished to preserve [the concealed] assets and not have them taken potentially in litigation or, if need be, sold and the assets used for personal reasons and not made available." J.A. 323-24. On that basis, the district court calculated the amount of intended loss as the value of the assets concealed by Hughes—$343,696. We find no error in this conclusion and affirm the determination of the district court on this issue.

## B.

Next, Hughes asserts that the district court erred in applying a two-level enhancement for "more than minimal planning." U.S.S.G. § 2F1.1(b)(2)(A). "[M]ore than minimal planning" is defined in part as "more planning than is typical for commission of the offense in a simple form." § 2F1.1, comment. (n.2) (incorporating by reference § 1B1.1, comment. (n.1(f))).

The district court found that Hughes' conduct in concealing his wife's assets met this standard based on the following: "[H]e engaged an appraiser. He arranged for auction houses. He actually transferred the assets, some of them at least himself, attended the auctions . . . . [H]e was clearly involved in trying to get these assets sold and get proceeds, again, all the time, not disclosing." J.A. 330. Hughes argues that his conduct involved nothing more than moving the assets from his home to the auction house and having them appraised: "There was a simple transfer—there was a simple appraisal," he asserts. Br. of Appellant at 29.

We review the district court conclusion that Hughes' offense involved more than minimal planning for clear error. *See United States v. Pearce*, 65 F.3d 22, 26 (4th Cir. 1995). Given the multiple steps taken by Hughes to have Gerstenfeld's assets transferred to the auction houses and appraised, we conclude that the district court did not clearly err in applying the enhancement for more than minimal planning.

## C.

Finally, Hughes argues that the district court erred in applying a two-level enhancement for obstruction of justice. We find no merit to any of Hughes' arguments on this issue.

## 1.

Hughes first contends that the enhancement to his bankruptcy fraud offense level constituted impermissible double-counting because his false statements before the bankruptcy court were part and parcel of his bankruptcy fraud offenses. As noted above, Hughes was convicted of three counts of bankruptcy fraud and two counts of perjury. Rather than imposing separate sentences for the bankruptcy fraud and perjury offenses, the district court grouped the offenses together, *see* U.S.S.G. § 3D1.2, imposed one sentence for the bankruptcy fraud offenses, and accounted for the perjury offenses by applying a two-level enhancement to the bankruptcy fraud offense level. No independent sentence was imposed for the perjury convictions. *See id.* § 3C1.1, comment. (n.8).[16]

---

[16]In relevant part, § 3C1.1, comment. (n.8) provides:

> If the defendant is convicted both of an obstruction offense . . . and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense . . . . The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

The district court calculation comported with these instructions.

An enhancement for obstruction of justice constitutes impermissible double-counting only when the conduct giving rise to the enhancement is identical to the conduct giving rise to the underlying conviction. *Compare United States v. Clark*, 316 F.3d 210, 213 (3d Cir. 2003) (rejecting enhancement when the obstruction—providing a forged birth certificate to authorities—was identical to the offense of falsely representing oneself as a United States citizen), *and United States v. Lamere*, 980 F.2d 506, 516-17 (8th Cir. 1992) (rejecting enhancement when the obstruction—concealing counterfeit money from investigators—was identical to the offense of possessing or concealing counterfeit money), *with United States v. Oladipupo*, 346 F.3d 384, 385-86 (2d Cir. 2003) (per curiam) (affirming enhancement when the obstruction—filling out an affidavit containing a false identity—was different from the offense of illegal reentry after deportation), *and United States v. Sabino*, 307 F.3d 446, 451 (6th Cir. 2002) (reversing ruling that imposition of enhancement was impermissible double-counting when the alleged obstruction—testifying falsely before a grand jury—did not arise from "precisely the same" conduct as did the underlying conspiracy offense (emphasis & internal quotation marks omitted)).[17] Here, the conduct giving rise to Hughes' bankruptcy fraud convictions included making false statements on the bankruptcy schedules, concealing assets from the bankruptcy trustee, and transferring assets for sale by the auction houses without the trustee's permission. In contrast, the conduct giving rise to the two-level enhancement for obstruction of justice consisted of Hughes' perjury before the bankruptcy court. Because the conduct giving rise to Hughes' bankruptcy fraud convictions was not identical to that giving rise to the obstruction enhancement, the district court did not err in applying the two-level enhancement under § 3C1.1.[18]

---

[17]*See also United States v. Mutuc*, 349 F.3d 930, 938 (7th Cir. 2003) (affirming obstruction enhancement to underlying bankruptcy fraud offense level). The facts of *Mutuc* are similar to those here: The defendant committed perjury in the context of a bankruptcy proceeding. He was convicted of bankruptcy fraud, and the court upheld a two-level obstruction enhancement to account for the defendant's perjury. However, the issue of double-counting was neither raised nor addressed by the court, so *Mutac* cannot be regarded as directly on point.

[18]We note that our decision may be in tension with the Eighth Circuit decision in *United States v. Lloyd*, 947 F.2d 339 (8th Cir. 1991) (per

Additionally, we note that our conclusion is consistent with Application Note 7 of § 3C1.1, which prohibits an obstruction enhancement if the defendant's underlying conviction is itself for an obstruction offense, unless the conduct further obstructed the investigation, prosecution, or sentencing of the obstruction offense significantly. *See* U.S.S.G. § 3C1.1, comment. (n.7). Note 7 enumerates those offenses that are considered obstruction offenses for purposes of this limitation: contempt, obstruction of justice, perjury or subornation of perjury, bribery of witness, failure to appear by material witness, failure to appear by defendant, payment to witness, accessory after the fact, or misprision of felony. *See id.* By enumerating a list of obstruction offenses and prohibiting enhancements to those offenses for obstructive conduct, the guidelines appear already to account for impermissible double-counting in this context. That bankruptcy fraud is not included in this enumerated list further supports our conclusion that the enhancement to Hughes' offense level did not reflect impermissible double-counting. The district court determination on this issue is therefore affirmed.

2.

Hughes next asserts that his perjurious statements were made in the bankruptcy court, not in the district court, and therefore fall outside the scope of the "investigation, prosecution, or sentencing of the *instant offense* of conviction." U.S.S.G. § 3C1.1(A) (emphasis added). The district court rejected this narrow interpretation of § 3C1.1: "The

---

curiam). There, the defendant was convicted of bankruptcy fraud and received an obstruction enhancement for concealing assets from the bankruptcy trustee and for committing perjury during the bankruptcy proceedings. The court of appeals reversed the enhancement because "[t]his conduct [was] the basis for the criminal charges against Lloyd." *Lloyd*, 947 F.2d at 340. It is unclear from the very brief opinion which conduct the court was referring to as "[t]his conduct." If the court was referring to the concealment of assets, *Lloyd* is in accord with the above-cited cases, because "concealing assets" was the conduct giving rise to Lloyd's bankruptcy fraud conviction. *Id.* However, to the extent the court was referring to the perjury, *Lloyd* contradicts the above cases because the perjury was not the conduct giving rise to the bankruptcy fraud conviction, yet the court still found impermissible double-counting.

whole transaction involving the defendant was being investigated by [the bankruptcy court]," and Hughes' perjury "was part and parcel of the whole transaction." J.A. 359-60. The conclusion of the district court was correct.

"'[I]nstant offense' in § 3C1.1 refers to the offense of conviction *including relevant conduct*." *United States v. Self*, 132 F.3d 1039, 1044 (4th Cir. 1997) (emphasis added). Here, the "instant offense[s]" were the bankruptcy fraud charges. Hughes' perjurious statements before the bankruptcy court fall within the definition of "relevant conduct" because they were "committed . . . by the defendant . . . during the commission of the offense of conviction . . . or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1) (defining relevant conduct). Therefore, under *Self*, Hughes' perjurious statements fall within the scope of "the instant offense of conviction," and the district court conclusion to that effect is affirmed. *Accord United States v. Bennett*, 252 F.3d 559, 566 (2d Cir. 2001) (upholding obstruction enhancement when defendant obstructed investigation by Securities and Exchange Commission that occurred before defendant was indicted).

3.

Finally, Hughes argues that his perjurious statements were not obstructive because he never disputed the existence of the personal assets; rather, he simply lied about authorizing their sale by the auction houses. Thus, according to Hughes, his perjurious statements did not impede the investigation in any way. The district court disagreed, finding that Hughes' statements represented "willful obstruction of justice . . . during the investigation of the instant offense of conviction." J.A. 361.

We review the district court conclusion that Hughes' statements were obstructive for clear error. *See United States v. Kiulin*, 360 F.3d 456, 460 (4th Cir. 2004). Because the bankruptcy court was investigating all aspects of Gerstenfeld's Chapter 11 petition, including the location and value of her personal assets and whether they had been transferred to the auction houses, we find that the conclusion of the district court that Hughes' perjurious statements were obstructive is not clearly erroneous.

## V.

For the reasons set forth above, we affirm Hughes' convictions. We also conclude that the district court did not err in its initial calculation of the guideline range. However, in light of *Booker*, we vacate Hughes' sentence and remand for resentencing. Because we conclude that the district court correctly determined the range prescribed by the guidelines, on remand the court shall consider that range[19] as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence.

*AFFIRMED IN PART, VACATED IN PART, AND*
*REMANDED WITH INSTRUCTIONS*

---

[19]Of course, if new circumstances have arisen or events occurred since Hughes was sentenced that impact the range prescribed by the guidelines, the district court should adjust its calculation accordingly.