ON REHEARING

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.                                    No. 03-4956

LARRY J. PIERCE, II,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CR-03-40)

Argued: December 3, 2004

Decided: May 26, 2005

Before MOTZ, GREGORY, and SHEDD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Shedd wrote the opinion, in which Judge Motz joined. Judge
Gregory wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Nancy Combs Dickenson, Lebanon, Virginia, for Appellant. Rick A. Mountcastle, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

**OPINION**

SHEDD, Circuit Judge:

Defendant Larry J. ("Jimmy") Pierce, II was convicted of ten counts of mail fraud and one count of conspiracy to commit mail fraud in connection with a bingo operation in southwest Virginia. Pierce challenges his conviction solely on the ground that he never caused the United States mails to be used in furtherance of the fraudulent scheme. He challenges his 33-month prison sentence on the grounds that (1) the district court's estimate of the loss resulting from the fraud exceeded the figure stipulated to by the Government in his coconspirators' sentencing proceedings, (2) the evidence at trial did not support the district court's estimate of the loss, and (3) the disparity between his sentence and his coconspirators' sentences violates the Equal Protection Clause. In his petition for rehearing, Pierce argues for the first time that his sentence must be vacated under *United States v. Booker*, 125 S. Ct. 738 (2005). For the reasons that follow, we affirm Pierce's conviction but vacate the sentence and remand this case for resentencing.

I.

Because Pierce challenges the sufficiency of the evidence supporting his conviction, we view the facts established at trial in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80 (1942).

Bristol Regional Speech and Hearing Center, Inc. ("Bristol") is a nonprofit charitable organization located in southwest Virginia. Bristol was authorized by Virginia law to pay outside agents to conduct bingo games to generate funds for its programs. Sue Wright, Bristol's director, testified that there was no authority or mechanism for the individuals who carried out the bingo operation on behalf of Bristol to share in any of the income derived from bingo sales. Bristol was to receive all the proceeds from any bingo game sold during a session.

Wright hired Linda Pierce to manage Bristol's bingo operation. Linda Pierce then hired her son Jimmy and two other relatives, Bill

Hoss and Bill Hoss II, to help her operate the bingo events. Bill Hoss called out the numbers, while Jimmy Pierce and Bill Hoss II conducted most of the sales activities. Linda Pierce had general supervisory authority and kept the records for the bingo operation. Wright rarely attended bingo sessions.

As early as 1997, the Hosses and Jimmy Pierce began purchasing extra cases of instant bingo games from Bristol's supplier, Woolwine Specialty Sales ("Woolwine"). Bill Hoss would purchase a number of cases on Bristol's account and then would purchase additional cases for cash. Jimmy Pierce and Bill Hoss II would sell these additional instant games at the same time that they sold Bristol's games. During a typical evening session, they might sell six cases of instant games for Bristol and four or five additional cases for themselves. As they made sales, Jimmy Pierce and Bill Hoss II deposited the cash proceeds into Bristol's cash drawer. At some point during or after the session, they withdrew from the cash drawer $166 for each case of instant games they sold for themselves. Jimmy Pierce and Bill Hoss II would then report to Linda Pierce (for official recordkeeping purposes) only the number of Bristol's games they sold. Using this information, Linda Pierce prepared a report for Bristol's records and mailed that report to Wright. Of course, the report understated the total number of instant games sold during each session.

A grand jury indicted Linda Pierce, Jimmy Pierce, Bill Hoss, and Bill Hoss II on eleven counts of mail fraud and one count of conspiracy to commit mail fraud. Bill Hoss and Bill Hoss II each pled guilty to one count of conspiracy to commit mail fraud. In its plea agreement with Bill Hoss, the Government stipulated that the loss resulting from the conspiracy was more than $70,000 but less than $120,000 and further agreed that Bill Hoss would be considered a minor participant in the conspiracy. In its plea agreement with Bill Hoss II, the Government stipulated that the loss was more than $120,000 but less than $200,000. Pursuant to their plea agreements, the Hosses agreed to testify against Linda Pierce and Jimmy Pierce.

During the trial of Linda Pierce and Jimmy Pierce, the Government produced records showing the number of off-the-books instant bingo games purchased from Woolwine by Jimmy Pierce and the Hosses from June 2001 through February 2002. Although there were no

records documenting purchases made before June 2001, Woolwine employee Angela Bowery testified that the number of off-the-books instant games purchased each month by Jimmy Pierce and the Hosses remained roughly the same from 1997 to 2002. Based on this evidence, Virginia Gaming Commission Agent Harrell Erwin calculated the total loss resulting from the fraudulent scheme, going back only to September 1999, to be $265,598.[1]

After a three-day trial, the jury acquitted Linda Pierce on all counts of the indictment. The jury convicted Jimmy Pierce of mail fraud and conspiracy to commit mail fraud, and the district court sentenced him to 33 months in prison with three years of supervised release. This appeal followed.

## II.

### A.

Pierce's conviction must be upheld if "there is substantial evidence, taking the view most favorable to the Government," to support it. *Glasser*, 315 U.S. at 80. "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (*en banc*). In evaluating the sufficiency of the evidence to support a criminal conviction, we assume that the jury resolved all contradictions in the testimony in favor of the Government. *United States v. Sun*, 278 F.3d 302, 313 (4th Cir. 2002).

In order to prove mail fraud, the Government must prove that the defendant (1) knowingly participated in a scheme to defraud and (2) mailed, or caused to be mailed, anything "for the purpose of executing such scheme." 18 U.S.C. § 1341. Both in the district court and on appeal, Pierce has challenged his mail fraud conviction solely on the

---

[1]Although Bowery testified that the off-the-books purchases began shortly after she began working for Woolwine in 1997, other witnesses tied the start of the conspiracy to an event that occurred in September 1999. Agent Erwin used the later date for purposes of his loss calculation.

ground that he never caused the United States mails to be used in furtherance of the fraudulent scheme.

A person "causes" the mails to be used when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954); *see also United States v. Edwards*, 188 F.3d 230, 235 (4th Cir. 1999) (stating that "proof that the use of the mails was, objectively, reasonably foreseeable is sufficient to support a conviction for conspiracy to commit mail fraud"). The evidence established that Linda Pierce mailed falsified reports of bingo game sales to Wright. The evidence also established that Jimmy Pierce provided his mother with information after each session so that she could prepare these reports for Wright. Since Wright was very rarely present onsite during bingo sessions, the jury could conclude — and it is not disputed on appeal — that Jimmy Pierce reasonably foresaw the use of the mails to deliver the daily bingo reports to Wright. Thus, Pierce "caused" the mails to be used.

Pierce contends, however, that the mailing of these daily bingo reports was not in furtherance of the fraudulent scheme because he had already obtained his profits from Bristol's cash drawer before the reports were actually mailed. According to Pierce, he cannot be liable under § 1341 because the mailing at issue was not necessary for his receiving the proceeds of the fraud. This argument is meritless.

Although the statute "does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud," *Kann v. United States*, 323 U.S. 88, 95 (1944), it is enough that the mailing be "incident to an essential part of the scheme, or a step in the plot," *Schmuck v. United States*, 489 U.S. 705, 711 (1989) (internal citations and quotations omitted). Importantly, "the use of the mails need not [itself] be an essential element of the scheme." *Id.* at 710; *see also United States v. Maze*, 414 U.S. 395, 400 (1974); *Pereira*, 347 U.S. at 8; *Edwards*, 188 F.3d at 235.

Moreover, the Supreme Court has stated that "[m]ailings occurring after receipt of the goods obtained by fraud are within the statute if

they were 'designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *United States v. Lane*, 474 U.S. 438, 451-52 (1986) (quoting *Maze*, 414 U.S. at 403). We have applied this doctrine to cases in which the mailings were made *after* the defendant obtained the victims' property. *See Godwin*, 272 F.3d at 668 (concluding that a jury could find that the defendant wrote a "lulling letter" to his victim "in an effort to placate her and to keep the fraud scheme active and ongoing"); *Morley v. Cohen*, 888 F.2d 1006, 1009-10 (4th Cir. 1989) (concluding that a jury could find that mailings made by the defendant to an investor after the investment was made lulled the investor into leaving his investment in the defendant's control and thus were part of the defendant's ongoing scheme to defraud); *United States v. Snowden*, 770 F.2d 393, 398 (4th Cir. 1985) (stating that "[l]ulling letters sent to innocent victims for the purpose of advancing a fraudulent and criminal scheme are sufficient to charge mail fraud, even where the letters follow the acquisition of the money in question").

Wright testified that Linda Pierce provided her with weekly reports for Bristol's bingo operation and that she relied on Linda Pierce's reports to report accurately the amount of income generated for Bristol. Wright further testified that she would have reported any off-the-books bingo sales to state regulators had she been made aware of such sales. Taken in the light most favorable to the Government, the evidence proved that the falsified bingo reports lulled Bristol into a false sense of security and effectively concealed Pierce's fraud.[2] In sum,

---

[2]The dissent argues that the mailings at issue here — the daily reports of bingo sales — did not further Pierce's fraudulent scheme because "[t]he fraud was effectively concealed when Pierce and Hoss II made their oral reports to Linda Pierce each night but omitted their sales from the off-the-books games. The fact that Linda Pierce wrote the sales down and later mailed a report is unrelated to furthering the fraud because all that was necessary to further the fraud had already occurred." *Post*, at 15. In fact, Linda Pierce's reporting to Wright — an agent of the victim of the fraud — was necessary to conceal the fraud because it kept Wright from suspecting any misconduct in the bingo operation. These mailings "help[ed] cloak the scheme with an aura of legitimacy, thereby prevent-

the evidence adduced at trial was sufficient to support Pierce's conviction for mail fraud.

## B.

Pierce also challenges the district court's computation of his sentence. The base offense level for mail fraud is six. *See* U.S.S.G. § 2B1.1(a) (2002).[3] The district court added two levels because the offense involved a misrepresentation that Pierce was acting on behalf of a charitable organization, *see* U.S.S.G. § 2B1.1(b)(7)(A), and it added another twelve levels because the loss resulting from the fraud exceeded $200,000, *see* U.S.S.G. § 2B1.1(b)(1)(G). With an adjusted offense level of twenty and a criminal history category I, Pierce was sentenced to 33 months' imprisonment, the most lenient sentence available under the applicable Sentencing Guidelines range.

## 1.

Pierce contends that he could not be held liable for a loss exceeding $200,000 because the Government stipulated, and the district court found, in separate proceedings involving Pierce's coconspirators, that the loss was no greater than $200,000. In its plea agreement with Bill Hoss, the Government stipulated that the loss resulting from the fraud was more than $70,000 but less than $120,000. In its plea agreement with Bill Hoss II, the Government stipulated that the loss was more than $120,000 but less than $200,000. According to Pierce, the Government should be estopped from attributing to him an amount of loss any greater than the amounts previously found by the district court in his coconspirators' cases. Pierce was not a party to those cases, however, and we agree with the Fifth and Ninth Circuits that the civil doctrine of nonmutual collateral estoppel has no application in criminal

---

ing its detection and allowing it to continue." *United States v. Lack*, 129 F.3d 403, 408 (7th Cir. 1997). Indeed, it was the use of the mails in this case — reasonably foreseen by Pierce — that allowed the fraudulent scheme to continue undetected for more than two years and allowed Pierce to retain the fruits of his fraud during that period.

[3]Pierce was sentenced according to the 2002 version of the Sentencing Guidelines.

sentencing. *See United States v. Montes*, 976 F.2d 235, 239 (5th Cir. 1992); *United States v. Valdez-Soto*, 31 F.3d 1467, 1476 (9th Cir. 1994); *cf. Standefer v. United States*, 447 U.S. 10, 21-25 (1980) (declining to apply nonmutual collateral estoppel in a criminal case). The district court was free to estimate the loss resulting from the fraud based on the information available to it in this case.

2.

Pierce next argues that the evidence presented at trial does not support the district court's finding that the fraud caused a loss to Bristol of $235,000. This finding resulted in a twelve-level enhancement to Pierce's base offense level. The Government must prove the amount of loss by a preponderance of evidence, and the district court must "make a reasonable estimate of the loss, given the available information." *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003); U.S.S.G. § 2B1.1, cmt. n. 2(C). The district court's estimate of loss presents a question of fact that we review for clear error. *Miller*, 316 F.3d at 503.

In arriving at the $235,000 figure, the district court began with Agent Erwin's estimate of the total loss — $265,598 — and deducted $30,000 in accordance with Sue Wright's estimate of the net loss to Bristol.[4] Agent Erwin computed the average monthly purchases of off-the-books bingo games during the period from June 2001 through February 2002 — the period for which records were available — and applied that average to each month going back to September 1999.[5] Agent Erwin's extrapolation was based on Angela Bowery's testimony that the conspiracy maintained the same level of purchasing activity throughout the duration of the conspiracy. To be sure, Bow-

---

[4]The presentence report adopted Agent Erwin's estimate and stated that the total loss was $265,598. The basis for Wright's lower estimate is unclear from the record, but the Government did not challenge her calculation. Either estimate would warrant the same enhancement under the applicable guideline, which calls for a twelve-level enhancement for any loss exceeding $200,000. *See* U.S.S.G. § 2B1.1(b)(1)(G).

[5]Agent Erwin made a more conservative estimate of loss by assuming, consistent with testimony from other witnesses, that the conspiracy began in September 1999 rather than sometime in 1997.

ery testified that she could only estimate the number of purchases made before she began keeping records. Nevertheless, the district court was only required to make a *reasonable estimate* of the loss, and we cannot say that its finding, based on Agent Erwin's calculations and Bowery's testimony, was clearly erroneous.

### 3.

Finally, Pierce challenges his sentence on the ground that the disparity between his sentence and his coconspirators' sentences constitutes an equal protection violation. A criminal sentence violates the Equal Protection Clause only if it reflects disparate treatment of similarly situated defendants lacking any rational basis. *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990). Pierce and his coconspirators are not similarly situated: Pierce was sentenced based on all the evidence adduced at trial, including Agent Erwin's final estimate of the loss resulting from the fraud, while the Hosses pled guilty and were sentenced based on the Government's stipulations and the information available prior to trial. The district court was required to "make a reasonable estimate of the loss, given the available information," U.S.S.G. § 2B1.1, cmt. n. 2(C), and the quality of that information changed over time. At the very least, this fact supplies a rational basis for the differing amounts of loss attributed to Pierce and his coconspirators.

A district court is not required to consider the sentences of codefendants, *United States v. Foutz*, 865 F.2d 617, 621 (4th Cir. 1989), and it is well settled that codefendants and even coconspirators may be sentenced differently for the same offense, *United States v. Quinn*, 359 F.3d 666, 682 (4th Cir. 2004); *United States v. Davis*, 98 F.3d 141, 145 (4th Cir. 1996). We have already concluded that the district court's estimate of the loss resulting from the fraud was appropriate under the Sentencing Guidelines, and the fact that Pierce's coconspirators were sentenced less harshly does not change that conclusion.

### C.

In his petition for rehearing, Pierce argues for the first time that his sentence must be vacated and his case remanded for resentencing pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005). In a supple-

mental brief responding to Pierce's argument, the Government concedes that a remand is required in this case.

This case is similar to *United States v. Hughes*, 401 F.3d 540, (4th Cir. 2005), where we vacated a criminal sentence and remanded for resentencing in accordance with *Booker*. As in *Hughes*, the district court here imposed the sentence mandated by the Sentencing Guidelines, based in part upon a fact that was not found by the jury, *i.e.*, the amount of the loss resulting from Pierce's fraud. *See id.* at 547-48 (concluding that application of sentencing enhancements based on judge-found facts was "error" that was "plain"). As in *Hughes*, the defendant here was sentenced to a longer term of imprisonment than the Sentencing Guidelines would have required had the district court not considered that fact. *See id.* at 548-49 (concluding that imposition of a sentence in excess of the maximum sentence permitted by the jury's verdict affected the defendant's substantial rights). Consistent with *Hughes*, we conclude that the district court committed an error that was plain and that affects Pierce's substantial rights, and we exercise our discretion to notice the error.[6] *See id.* at 555-56. Accordingly, we remand this case for resentencing in accordance with *Booker*.[7]

---

[6]Just as we noted in *Hughes*, "[w]e of course offer no criticism of the district judge, who followed the law and procedure in effect at the time" of Pierce's sentencing. 401 F.3d at 545 n.4; *see generally Johnson v. United States*, 520 U.S. 461, 468 (1997) (stating that an error is "plain" if "the law at the time of trial was settled and clearly contrary to the law at the time of appeal").

[7]Although the Guidelines are no longer mandatory, *Booker* makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." 125 S. Ct. at 767. On remand, the district court should first determine the appropriate sentencing range under the Guidelines, making all factual findings appropriate for that determination. *Hughes*, 401 F.3d at 546. The court should consider this sentencing range along with the other factors described in 18 U.S.C. § 3553(a), and then impose a sentence. *Id.* If that sentence falls outside the Guidelines range, the court should explain its reasons for the departure, as required by 18 U.S.C. § 3553(c)(2). *Id.* The sentence must be "within the statutorily prescribed range and . . . reasonable." *Hughes*, 401 F.3d at 547.

III.

Substantial evidence supports the jury's finding that the mailings of falsified bingo reports were at least reasonably foreseeable by Pierce, and that finding is sufficient to uphold the conviction in this case. The district court's estimate of the loss resulting from the fraud was not clearly erroneous, and we reject Pierce's various challenges to the calculation of his sentence under the Sentencing Guidelines. Nevertheless, we vacate Pierce's sentence and remand this case for resentencing in accordance with *Booker*.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

It is axiomatic that not all fraud is federal fraud. Rather, the federal mail fraud statute reaches only "those limited instances in which the use of the mails is *a part of the execution of the fraud*, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1960) (emphasis added). Because I believe that this is such a case that should be left to state law, I respectfully dissent as to the sufficiency of the evidence on Pierce's conviction. The majority's attempt to fit the facts of this case into the federal mail fraud statute goes beyond existing precedent and demonstrates the dangers inherent in extending federal jurisdiction further than Congress intended to go.

I.

The majority affirms Pierce's mail fraud conviction under 18 U.S.C. § 1341. A jury found that Pierce had defrauded Bristol by selling "off-the-books" instant bingo games during sessions in which they would also sell games for Bristol and then pocketing the profits. The scheme, which began perhaps as early as 1997 and ended in early 2001, entailed purchases of the "off-the-books" instant bingo games every few weeks and illegal sales at bingo sessions each weekend. At the end of each session, Hoss II and Pierce would orally report to Linda Pierce how many bingo games they had sold for Bristol but

they did not report to her their sales of the "off-the-books" instant bingo games.[1] Linda Pierce, who was acquitted on all counts, sent weekly bingo summary reports to Bristol, which included the tallies of the bingo games sold, through the U.S. mail.

## II.

Pierce's conviction for mail fraud turns on whether the mailing of the weekly reports were used to conceal the scheme or rather whether the scheme had already come to fruition when the mailings occurred. Whether a mailing is deemed to be for the purpose of executing a scheme to defraud depends on "whether the mailings were sufficiently closely related to (the defendant's) scheme to bring his conduct within the statute." *United States v. Maze*, 414 U.S. 395, 399 (1974). The Supreme Court's jurisprudence on the question of when a mailing acts in furtherance of fraud has evolved from a narrow to a broad reading. Yet, a review of the history of this jurisprudence demonstrates that Pierce's conduct does not fit even within the Court's more recent expansive reading of the statute.

In *Kann v. United States*,[2] 323 U.S. 88 (1944), and *Parr v. United States*, 363 U.S. 370 (1960),[3] the Court read the mail fraud statute

[1]No allegation was made that Pierce sold games purchased on Bristol's account and kept the proceeds as his own.

[2]In *Kann*, the defendants set up a dummy corporation through which they diverted funds from another corporation for their own use. 323 U.S. at 92-93. They deposited or cashed checks drawn on these diverted funds at various banks which mailed the checks to the drawee bank. *Id.* at 93. The Court set aside their convictions on the ground that the mailings occurred after their scheme had come to fruition because the defendants had already received the money they intended to receive and it was immaterial to them how the bank which paid or credited the check would collect from the drawee bank. *Id.* at 94.

[3]In *Parr*, the defendants made unauthorized gasoline purchases using their employer's credit card. 363 U.S. at 383. The oil company mailed invoices to the credit card holder, and in return, payment was sent through the mail. *Id.* The Court reversed the defendants' mail fraud convictions finding the mailings were not sufficiently connected to the scheme because it was immaterial to defendants how the oil company received payment for its services. *Id.* at 393.

somewhat restrictively overturning mail fraud convictions on the ground that the schemes had reached fruition before the mailings occurred. In doing so, it looked at the individual transactions in each case separately and found that once the proceeds for each transaction were received, the schemes ended. The subsequent mailings, it noted, were either merely incidental and collateral or immaterial to the schemes in question. *See Parr*, 363 U.S. at 393; *Kann*, 323 U.S. at 95.

But in *United States v. Sampson*, 371 U.S. 75 (1962), the Court seemingly shifted to a more expansive analysis by upholding a mail fraud conviction in which the mailings were sent to the victims of the fraud after the defendants had received the victims' money. *Id.* at 78. It distinguished its decisions in *Kann* and *Parr* stating that in those cases the schemes had come to fruition before the mails were used. *Id.* at 80. In contrast, in *Sampson*, the mailings were made for the purpose of lulling the victims into believing that the defendants would perform the promised services and were done as part of the "previously formulated plan." *Id.* at 81.

The Court went further still in *Schmuck v. United States*, 489 U.S. 705 (1989), holding that the defendant, who purchased used cars, rolled back their odometers, and then sold them to unwitting car dealers with artificially inflated prices, was properly convicted of mail fraud based upon the car dealers' subsequent mailing of documents transferring title to their customers. *Id.* at 172. It found that these mailings satisfied the mail fraud statute reasoning that "a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title." *Id.*

The Court found it "sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." *Id.* at 710-11 (internal citations and quotations omitted). It distinguished *Kann* and *Parr* noting that the mailings in those cases "involved little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Id.* at 714.[4] Rather, it empha-

---

[4]Justice Scalia wrote a strong dissent in which he found the majority's opinion to be "inconsistent" with the Court's prior cases. *Schmuck*, 489 U.S. at 722 (Scalia, J., dissenting).

sized that "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Id.* at 715.

While this line of cases suggests an ever-expanding view on when a mailing is "for the purpose of executing such scheme," we should be mindful that this latter element is not simply a jurisdictional hook.[5] Not every mailing will have a sufficient relationship to the fraud in question to make the fraud a federal crime. The Court's holding in *Schmuck* helps to focus this analysis. By stating, as noted above, that the relevant question is whether the perpetrator conceived the mailing as part of the scheme, the Court injected a subjective component into the inquiry. Thus, in determining how the mailing interacts with the fraud, we must focus on whether the scheme, as conceived by Pierce, had come to fruition when the mailing occurred or whether the mailing acted as part of the scheme by concealing it.[6]

---

[5]Prior amendments to the mail fraud statute support this reading. Congress amended the statute in 1909 to eliminate language requiring proof that the scheme would be "effected by either opening or intending to open correspondence or communication with any other person . . . by means of the post-office establishment of the United States . . . ." *See* Peter J. Henning, *Maybe It Should Just Be Called Federal Fraud: The Changing Nature of The Mail Fraud Statute*, 36 B.C. L. Rev. 435, 447 (1995). It replaced it with the language at issue in this case, which requires that the mails be used "for the purpose of executing such scheme." *Id.* at 448. Thus, this "amended mail fraud statute did not completely eliminate the required nexus between the scheme to defraud and the mailing element, nor did it explicitly reduce the use of the mails to a mere predicate for federal jurisdiction." *Id.*

[6]As the Fifth Circuit has aptly concluded:

> Synthesizing the Supreme Court's holding in *Schmuck* with these other precedents — which the Court accepted — and in breaking down *Schmuck*'s rationale, it is clear that the Court's statement that a mailing need merely be "incident to an essential part of the scheme" to satisfy the mail fraud statute is cabined by the materiality of the mailing, as well as its timing: A tangential mailing occurring after the success of a fraud scheme is complete would never qualify, even if the mailing is "incidental" to a part of the scheme.

*United States v. Strong*, 371 F.3d 225, 229 (5th Cir. 2004).

### III.

The majority concludes that these "falsified bingo reports lulled Bristol into a false sense of security and effectively concealed Pierce's fraud." *Ante* at 6. It reasons that Bristol would have discovered the fraud if the weekly reports that Linda Pierce mailed to Bristol showed both the revenue from the Bristol-purchased games and the revenue from the "off-the-books" games. While I agree that this argument has initial appeal, it fails to consider that the preparation and mailing of the weekly reports by Linda Pierce was a step once-removed from the actual concealment of the fraud.

The fraud was effectively concealed when Pierce and Hoss II made their oral reports to Linda Pierce each night but omitted their sales from the off-the-books games. The fact that Linda Pierce wrote the sales down and later mailed a report is unrelated to furthering the fraud because all that was necessary to further the fraud had already occurred. In this respect, the mailings did not further the fraud or conceal the fraud, the oral reports to Linda Pierce furthered and concealed the fraud. Put another way, these mailings were "not part of the execution of the scheme as conceived by the perpetrator at the time," *Sampson*, 489 U.S. at 715, because Pierce's scheme involved selling "off-the-books" games while only reporting to Linda the games he sold for Bristol. Once he had done those acts, he had succeeded in completing the current fraud as well as protecting the success of future fraud.

The majority's emphasis on cases in which defendants "lulled" victims into a false sense of security is inapposite. In each of those cases, the "lulling" mailings were made after the defendant obtained the victim's property but before the scheme had come to fruition. The mailings were thus a part of the scheme. At the point that the mailings were made in this case, the scheme was already both concealed and complete. In addition, the mailings in this case were not "lulling" letters full of false promises to victims, they were reports which accurately stated the number of instant bingo games that Pierce sold on behalf of Bristol.[7]

---

[7]By this statement, I am only noting that these mailings did not contain "lulling" statements. Mailings that are innocent in and of themselves can be used to obtain a conviction under the federal mail fraud statute. *Badders v. United States*, 240 U.S. 391, 394 (1916).

For these reasons, I believe that the majority's analysis goes beyond existing case law interpreting the scope of the mail fraud statute.[8] To be sure, the mail fraud statute has been subject to an increasingly broad reading. But if the majority's interpretation of the mailing in this case as one "for the purpose of executing such scheme," 18 U.S.C. § 1341, is correct, then I do not see how this element functions as anything more than a jurisdictional requirement. As long as federal prosecutors can find some mailing that they can point a jury to, no matter how tangential that mailing is, then they will have at their disposal the ability to make all fraud with any sort of mailing connected to it, a federal case. If this is what Congress intended, then they would have written the statute to state as much, instead, they limited it to those cases in which the mailing's purpose is for execution of the scheme.

I recognize that the mail fraud statute has come to be used as a "stopgap device to deal on a temporary basis with [a new fraud scheme], until particularized legislation can be developed and passed to deal directly with the evil." *Maze*, 414 U.S. at 405-06 (Burger, C.J., dissenting). However, the confusion in the jurisprudence surrounding the mail fraud statute leaves the very real possibility that courts and federal prosecutors will enforce the statute in arbitrary and unforeseeable ways. Infusing even more uncertainty in the criminal justice system, as the majority's opinion does, is not (or should not be) in keeping with our justice system. I thus respectfully dissent as to the sufficiency of the evidence on Pierce's conviction for mail fraud. I concur with the majority in vacating Pierce's sentence under *United States v. Booker*, 125 S. Ct. 738 (2005), and remanding this case to the district court for resentencing.

---

[8]The conduct by Pierce in this case was egregious. He sold bingo games for his own profit while he was selling games for a charitable organization. Yet, the State of Virginia is fully capable of dealing with Pierce's crimes and punishing him accordingly.