**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4465**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

GEORGE WILLIAM BRADSHAW, II,

        Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg. Frederick P. Stamp, Jr., Senior District Judge. (3:05-cr-00073-FPS)

Argued: May 14, 2008          Decided: June 24, 2008

Before MICHAEL and DUNCAN, Circuit Judges, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Byron Craig Manford, Martinsburg, West Virginia, for Appellant. Paul Thomas Camilletti, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee. **ON BRIEF:** Sharon L. Potter, United States Attorney, Wheeling, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

George William Bradshaw, II, former commander of the West Virginia state police detachment at Martinsburg, appeals from his conviction of one count of mail fraud under 18 U.S.C. § 1341. At trial the government contended that Bradshaw had devised a fraudulent scheme to steal cash that had been seized as evidence. According to the government, Bradshaw, in furtherance of his scheme, falsely reported to the state treasury department (through the mail) that there was no unclaimed property at the Martinsburg detachment. After the jury returned a guilty verdict, the district court denied Bradshaw's motion for judgment of acquittal and sentenced him to fifteen months' incarceration followed by three years of supervised release. On appeal Bradshaw argues (1) that the evidence was insufficient to support his mail fraud conviction and (2) that the district court abused its discretion by admitting evidence of a theft that was not alleged in the indictment. As explained below, we reject Bradshaw's claims and affirm his conviction and sentence.

I.

On November 15, 2005, a grand jury in the Northern District of West Virginia returned an indictment against Bradshaw for one count of mail fraud. The indictment alleged that Bradshaw sent an unclaimed property report to the West Virginia state

2

treasurer's office in furtherance of his scheme to steal cash that had been seized as evidence.  The indictment alleged that an audit of the Martinsburg detachment revealed that seized cash was missing in twenty different cases, and it described eight of the missing seizures of cash in more detail.

Bradshaw's four-day trial began on August 1, 2006, and the following evidence was introduced.  Government testimony described the procedures for recording and storing seized evidence at the Martinsburg detachment.  After seizing evidence from a criminal suspect, the officer completes an evidence report on form 109.  The officer then turns over the evidence (and the completed form 109) to a supervisor, and the supervisor places the evidence in the evidence room, noting this on the 109 form.  In addition, the evidence is recorded in a property disposition report on form 31.  The completed 109 and 31 forms are stored in separate binders in the evidence room.  Copies are also kept with the criminal investigation reports elsewhere at the detachment.

All state agencies are required by law to report unclaimed property annually to the West Virginia state treasurer. Treasury personnel visit the agencies to collect the unclaimed property, and unclaimed cash is deposited into the general revenue fund of the state. Property is deemed unclaimed if (1) it has been in law enforcement hands for at least six months; (2) there is no reasonable likelihood that it can be returned to the owner; and (3)

3

it has no evidentiary value. Most seizures of cash in drug trafficking cases undergo forfeiture to the state through a different process and do not qualify as unclaimed property.

In late 2002 an undercover officer became aware that cash seized in two different cases was missing from the Martinsburg detachment, and he began an investigation of the whereabouts of all cash seized by the detachment. The officer uncovered several instances of missing cash, and in mid-September 2004 First Sergeant Scott Dillon was assigned to investigate thefts of money from the Martinsburg detachment evidence room. At trial Dillon testified about nine missing seizures of money, ranging in amount from $341 to $2880. Because only eight of these seizures had been described in the indictment, Bradshaw requested and received a limiting instruction from the district court prior to testimony about the ninth seizure (the Tigney seizure). The district court cautioned the jury that the evidence about the Tigney seizure was not be used to conclude "that the defendant has bad character in general . . . [or] is more likely to have committed the crime for which he is currently charged." J.A. 684.

Each of the nine seizures occurred between 1999 and 2001. In most cases, the original 109 and 31 forms in the evidence room had been replaced. The new forms deleted the reference to the cash seizures and instead reported seizures of other evidence (usually blood alcohol kits) that did not exist. The new forms were in

4

Bradshaw's handwriting. In other cases the 31 and 109 forms for the actual cases were missing, and Bradshaw had placed dummy forms that did not link to actual cases in the same locations in the binders. Forfeiture orders were ultimately issued for seven of the seizures, thereby rendering them property of the state. Two seizures did not undergo forfeiture. Dillon testified that at least one of these non-forfeited seizures (the Lewis seizure) should have been reported as unclaimed property to the state treasurer. Nonetheless, in July 2001 Bradshaw mailed the Martinsburg detachment annual unclaimed property report to the treasurer's office, stating that the detachment had no unclaimed property for the period of July 1, 2000, through June 30, 2001.

The jury returned a verdict of guilty, and Bradshaw moved for judgment of acquittal. After briefing and argument, the district court denied the motion and scheduled the matter for sentencing. At sentencing the district court calculated that Bradshaw's conduct resulted in a $10,179.60 loss based on his total thefts and sentenced him to fifteen months' incarceration followed by three years of supervised release. Bradshaw filed a timely notice of appeal.

II.

Bradshaw first argues that the district court erred in denying his motion for judgment of acquittal. We review de novo a district court's denial of a motion for judgment of acquittal. See United States v. Ryan-Webster, 353 F.3d 353, 359 (4th Cir. 2003). We must sustain a guilty verdict if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by "'substantial evidence.'" United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id.

To obtain a mail fraud conviction, the prosecution must prove that "the defendant (1) knowingly participated in a scheme to defraud and (2) mailed . . . anything 'for the purpose of executing that scheme.'" United States v. Pierce, 409 F.3d 228, 232 (4th Cir. 2005) (quoting 18 U.S.C. § 1341). A mailing is considered to be "for the purpose of executing" a fraudulent scheme if it is "designed to lull the victims into a false sense of security," even if it is "incident to an essential part of the scheme." Id. (quoting Schmuck v. United States, 489 U.S. 705, 711 (1989); United States v. Lane, 474 U.S. 438, 451-52 (1986)) (internal quotation marks omitted). Thus, a mailing that is accurate, routine, or sent

6

after the goods have been received can support a mail fraud conviction, so long as the mailing was designed to "make apprehension of the defendant[] less likely." Lane, 474 U.S. at 451-52; see Schmuck, 489 U.S. at 715.

Bradshaw advances several arguments in support of his position that his mailing was not in furtherance of the scheme to defraud. First, Bradshaw argues that the mailing and the fraudulent scheme were insufficiently connected because the cash was stolen prior to the mailing. However, "[m]ailings occurring after receipt of the goods obtained by fraud are within the statute if they were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." Lane, 474 U.S. at 451-52 (internal quotation marks and citation omitted). Here a reasonable jury could have found that Bradshaw sent the mailing, which falsely informed the treasury that there was no unclaimed property, to ensure that the treasury would not come to the detachment to collect the property and discover the missing cash. Because the mailing was designed to "lull the victim[]" -- the state treasury -- it is of no moment that the mailing occurred after Bradshaw stole the cash. Id.

Bradshaw next asserts that the mailing was unconnected to the fraudulent scheme because the mailing accurately reported that

7

there was no unclaimed property at the Martinsburg detachment. Bradshaw argues that the Lewis seizure did not meet the three-part test for unclaimed property because it had evidentiary value. While the evidence could be interpreted to support Bradshaw's contention, we must review the record in the light most favorable to the government. See Burgos, 94 F.3d at 862. At trial Dillon testified that the Lewis seizure did not have evidentiary value because, although the cash was recovered from the street at the scene of a crime, it could not actually be linked to the crime. Thus, a reasonable jury could have concluded that Bradshaw's report to the treasury was false, lending further support to the government's position that the mailing was designed to further Bradshaw's scheme.

Finally, Bradshaw contends that the mailing did not further his fraud because a report of no unclaimed property would be unusual and thus lead to heightened suspicion from the state treasury. But "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive." Schmuck, 489 U.S. at 715. Because a reasonable jury could have concluded that Bradshaw believed at the time that the mailing would conceal his scheme from detection, this argument is foreclosed as well.

Thus, in reviewing the evidence, we find that there was sufficient evidence to support the jury's verdict of guilt. We therefore affirm the district court's denial of the motion for judgment of acquittal.

## III.

Bradshaw next argues that the district court erred by failing to exclude evidence of the Tigney seizure under Federal Rule of Evidence Rule 404(b).

Rule 404(b) prohibits the admission of "[e]vidence of other crimes, wrongs, or acts" for the purpose of showing a defendant's propensity to commit a crime. Fed. R. Evid. 404(b). Rule 404(b) does, however, allow prior bad act evidence to be included "for purposes other than character, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" United States v. Queen, 132 F.3d 991, 994 (4th Cir. 1997) (quoting Fed. R. Evid. 404(b)). We review a district court's rulings under Rule 404(b) for abuse of discretion. Id. at 995. A district court has abused its discretion if the admitted evidence fails to meet the following criteria:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . . (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4)

9

> the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

Id. at 997. Furthermore, the defendant's interests are better protected if the court instructs the jury to limit consideration of the evidence to the purposes permitted by the rule. Id.

Bradshaw argues that the evidence of the Tigney seizure was not probative under the second part of the test, because Bradshaw was not required to report the Tigney seizure in the mailing. However, the evidence does not have to be directly linked to the mailing itself to be probative of the elements of the mail fraud offense. The first element of mail fraud -- knowing participation in a scheme to defraud -- can extend beyond the specific mailing. Pierce, 409 F.3d at 232. Bradshaw's theft of the Tigney seizure and his replacement of the records with falsified forms were part of Bradshaw's larger scheme to defraud, which the mailing served to further. Thus, introduction of the evidence related to the Tigney seizure, which included forms in Bradshaw's handwriting, helped prove Bradshaw's knowledge of and participation in the scheme. The Tigney seizure was also probative of the second element of mail fraud, that the mailing furthered the scheme. This theft (of a somewhat larger amount of money than the other thefts) provided Bradshaw with an increased motive to conceal his activities, a goal that was furthered by mailing the unclaimed

10

property form to the state treasury.  Thus, the Tigney evidence was probative, and the second part of the test is satisfied.

Bradshaw also argues that the evidence was unduly prejudicial "because of the sheer volume of the exhibits," and thus failed to meet the fourth part of the Queen test.  Appellant's Br. 35.  The introduction of nine, rather than eight, examples of Bradshaw's scheme to steal cash from the Martinsburg detachment would not lead a jury to "subordinate reason to emotion in the factfinding process."  Queen, 132 F.3d at 997.  The theft of the Tigney seizure followed the same pattern as the other thefts in the scheme and did not present any particularly shocking facts.  Furthermore, the district court repeatedly cautioned the jury that it could not consider the evidence for proof of character or propensity, including one such instruction that directly preceded the introduction of the contested evidence.  Thus, the evidence provided relevant, probative support to the government's contention that Bradshaw was actively engaged in defrauding the detachment and the state treasury, and it presented little risk of unfair prejudice.  The evidence thus meets the fourth part of the test.

Because the evidence about the Tigney seizure met all four parts of the Queen test, the district court did not abuse its discretion by admitting the evidence.  We thus reject Bradshaw's second claim as well.

11

IV.

Bradshaw finally argues that the district court's calculation of loss for sentencing purposes was clear error, because the court included the loss from all of the stolen seizures rather than solely the seizure that should have been reported in the unclaimed property report.  This argument is unavailing.  The loss calculation for a mail fraud conviction may include any loss from the fraudulent scheme that the mailing furthered.  <u>See</u> <u>Pierce</u>, 409 F.3d at 234.  The district court appropriately considered only those losses from Bradshaw's scheme that the government proved by a preponderance of the evidence.  We therefore affirm Bradshaw's sentence of fifteen months' imprisonment and three years of supervised release.

* * *

For the foregoing reasons, Bradshaw's conviction and sentence are

<u>AFFIRMED</u>.